Lawrence Fleming and Mary A. Fleming v. Commissioner.
Fleming v. Commissioner
Docket No. 3180-71.
United States Tax Court
T.C. Memo 1972-155; 1972 Tax Ct. Memo LEXIS 101; 31 T.C.M. (CCH) 772; T.C.M. (RIA) 72155; July 24, 1972, Filed. Tried in Seattle, Washington. Lawrence Fleming, P.O. Box 138, Mossyrock, Wash., pro se. Miller Lesch, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income tax liability of petitioners for the taxable years 1967 and 1968 in the respective amounts of $1,814.93 and $2,118.81. The issue is whether petitioners realized ordinary income in taxable years 1967 and 1968 on amounts they received pursuant to an agreement with the Pacific Sand and Gravel Co. for removal of sand and gravel from their real property. Findings of Fact Most of the facts and exhibits have been stipulated; they are so found and incorporated herein by this reference. Petitioners, Lawrence and Mary A. Fleming, filed joint Federal income tax returns with the Western Service Center at Ogden, Utah, for the years *102 1967 and 1968. Petitioners, legal residence on the date of filing the petition herein was Mossyrock, Washington. Petitioner Mary A. Fleming is a party herein only by reason of having filed a joint return with her husband, Lawrence Fleming, and the latter will hereinafter be referred to as petitioner or Fleming. On November 24, 1965, petitioner by agreement acquired from J. Melvin and Willa S. Core the right to excavate certain materials from real property, the legal description of which is as follows: S.E. Corner of N.W. 1/4 of N.W. 1/4 of Section 1 Township twelve (12) North, Range two (2) East of Willamette Meridian Lying North of the Paul Larson Road, in Lewis County, Washington - Two hundred (200) Yards Square, approximately Seven (7) Acres. The agreement extended to petitioner the right to remove sand, gravel and aggregate from the premises for a period of three years at a price of ten cents per yard. This price was subject to adjustment should petitioner's sale price for the materials advance. The agreement provided for a three-year option to renew on the same terms and conditions. On July 7, 1966, petitioner leased the aforementioned property to Pacific Sand & Gravel *103 Co. (Pacific) for a period of two years. There is no evidence that at the time of the execution of this lease the parties attempted to ascertain the extent of the mineral deposits in place. Pacific by the agreement was granted the exclusive right to explore for, excavate, remove, process and stockpile sand, gravel, rock and other aggregate from the premises. Pacific contracted to pay to Fleming the sum of 20 cents per cubic yard or 15 cents per ton for all materials sold. The lease further provided in pertinent part: Lessee agrees to commence crushing operations upon the above described tract within 45 days from the date hereof, if operations are not so commenced within said time (unless prevented by causes beyond the control of Lessee) then this lease, at the option of Lessors may be terminated if crushing operations are not commenced within 10 days after written notice. Lessee agrees to remove and pay for a minimum of 50,000 tons of materials during the term of this lease; provided, however, that the obligation to remove and pay for said minimum is on the condition that the sand, gravel, crushed rock or other aggregate produced from the aforesaid premises shall meet and comply *104 with state approved specifications. In the event that said material does not meet said specifications, then the obligation of Lessee to continue crushing operations or to comply with the aforesaid minimum shall be of no force or effect. Between July 7, 1966, and December 31, 1966, Pacific removed and paid for materials in excess of the 50,000 ton minimum provided in the lease. Petitioner reported $7,257.84 received for the materials in 1966 773 as gain from the sale of a capital asset. Petitioners' 1966 return was not audited and is not in issue. On February 6, 1967, petitioner purchased outright the property subject to the above lease. For the years 1967 and 1968 Pacific, while under no obligation, removed amounts of gravel and sand from petitioner's property. This resulted in further payments from Pacific in those years. In his return for the taxable years 1967 and 1968 petitioner treated the amounts received under the agreement with Pacific as gain resulting from the sale of a capital asset. Respondent in his notice of deficiency increased petitioner's taxable income to reflect his determination that these amounts constituted ordinary income. Opinion We are faced with *105 the familar issue of whether amounts received in connection with a contract permitting removal of sand and gravel from taxpayer's property are taxable as capital gain or as ordinary income. The resolution of this question requires a determination of whether the taxpayer has by his contractual liability retained an interest which must be classified as an "economic interest." See ; and (C.A. 9, 1968), affirming a Memorandum Opinion of this Court. The retained "economic interest" exists where a taxpayer has: "(1) 'acquired by investment, any interest in * * * [the minerals] in place,' and (2) secured by legal relationship 'income derived from the extraction of * * * [the mineral], to which he must look for a return of his capital.'" [ (C.A. 5, 1967), citing See also , on appeal (C.A. 3, Mar. 10, 1971). In the present case we concern ourselves only with petitioner's status under the second part *106 of the definition. [1] The rule governing this second part of the test, seems to be that where there is in fact a sale of the material "in place," the owner has sold part of his real estate and any profit realized thereby is therefore not disqualified from being regarded as capital gain by reason of the form of the transaction. * * * On the other hand where the owner does not part with his entire interest in the deposits until removed * * * but in effect merely enters into a lease for the exploitation of his land * * * or otherwise merely makes arrangements * * * to sell the materials at a unit price from time to time as they are extracted * * *, the transaction has not been considered as a sale of a portion of the land entitling the owner to the benefit of the capital gains provisions. [2
*107 In determining whether the payments are dependent upon extraction, i.e., whether the lessor has a retained economic interest, the courts have weighed such factors as: the intent of the parties; the language used in the instrument of transaction; the requirement, or likelihood, that all the mineral will be extracted; * * * the absence of an affirmative duty to mine * * * [] After weighing these same factors, we conclude that petitioner did not sell gravel in place, rather he retained an economic interest evidenced by a lease agreement with payments dependent on extraction. Consequently, he is not entitled to capital gains treatment of the proceeds of that 774 agreement. The strongest contraindication of an intent to sell the gravel in place is shown by that portion of the agreement which states: "In the event that said material does not meet said specifications, then the obligation of the Lessee to continue crushing operations or to comply with the aforesaid minimum shall be of no force or effect." The case of , on appeal (C.A. 7, Nov. 5, 1971), involved a similar clause *108 limiting the buyer's duty to remove and pay for materials. The contingency in that case "was considered a significant indication that the seller had to look to the extraction of the [material] to recover her capital." . See also ; and (C.A. 6, 1968). Intention certainly is another factor we must consider: "It is the intent of both parties, as evidenced by their agreement, which * * * must be considered in determining whether an economic interest has been retained." . In discerning the parties' intent herein we have turned to the following objective standards: (1) The language of the contractual agreement. (2) The lack of any showing that the agreement provided for the extraction of all of the material on petitioner's land. We recognize that the application of the "economic interest" doctrine is not determined by the labeling of the transaction as found in the governing instrument. See (C.A. 7, 1966). However, *109 there is abundant case law which recognizes that contracts, such as the one in the present case, which contain language naming the parties as "lessor" and "lessee" and payments as "rents" are an indication that the contracting parties intended a leasing arrangement. See (C.A. 5, 1957), affirming in part ; (C.A. 8, 1967); and (C.A. 7, 1967). A further factor supporting a holding that no sale took place is the failure of the parties to ascertain the extent of the mineral deposits in place and provide for an unconditional sale of such. See ; cf. ; and . There is only one element that even remotely favors petitioner's position. That is the fact that the agreement provided for a minimum purchase by Pacific. However, for the years 1967 and 1968 the minimum obligation was no longer effective. Furthermore the courts have generally discounted such minimums as evidence of a *110 sale. See (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, certiorari denied ; and See also Campbell P. Ridley, 58 T.C. - (1972). The 50,000 ton minimum in the initial agreement was met in 1966. Nothing in the lease contract indicates there was an obligation on Pacific's part to pay for anything except for specific amounts quarried in subsequent years. There was no requirement that all the materials be extracted, and the agreement fixed no further maximum or minimum amounts which Pacific was to quarry. In fact, for the years 1967 and 1968 Pacific had no affirmative duty to mine at all. Under such circumstances, it is quite apparent that for the years 1967 and 1968 petitioner was in possession of an "economic interest" in the property in question and respondent's determination must stand. Decision will be entered for the respondent. Footnotes
1. Ordinarily [the first part] of the test becomes important only where the taxpayer is claiming that the proceeds are regular income, subject to a depletion allowance. The commissioner may question whether such taxpayer ever had an investment interest in the property. But where, as here, the taxpayer is claiming that the proceeds represent a capital gain, there is usually no contention by the commissioner that the taxpayer has never had an investment interest in the property. His position, rather, is generally that the taxpayer has always had an investment interest and still retains it, at least in part. [, at fn. 4 (C.A. 9, 1957)] ↩
2. The rationale for this doctrine has been succinctly stated in . The Court in that case pointed out that capital gains treatment is designed to avoid the hardship of taxing as income in one year the entire gain due to appreciation of the value of the capital asset over a considerable period of time. [It] is evident that the taxation of the receipts of the lessor as income does not ordinarily produce the kind of hardship aimed at by the capital gains provision of the taxing act. * * * abstraction [of minerals] from the soil [by the lessee] is a time-consuming operation, and the payments made by the lessee to the lessor do not normally become payable as the result of a single transaction within the taxable year, as in the case of a sale of property. * * * [] See also , (C.A. 5, 1967).↩